LEVI G. BLISS, APPELLANT (CONTESTANT), v. THOMAS
R. WOOLLEY, RESPONDENT (INCUMBENT).

C. ERIC NORDELL, APPELLANT (CONTESTANT), v. CLAR-
ENCE G. VANNOTE, RESPONDENT (INCUMBENT).

Submitted March 25, 1902—Decided June 9, 1902.

Official ballots furnished to the electors by a municipal clerk under
his construction of a statute of uncertain meaning, and endorsed
with a fac-simile of his signature, are not upon that account
marked ballots within the eighty-fifth section of the Election law,
but are to be treated, at the election for which they were provided,
in all respects as legal votes irrespective of the correctness of the
clerk's construction of the law.

On appeal in matter of contested election.

Heard upon an agreed state of facts before the Circuit
Court of Monmouth county, whose decision was as follows:

"FORT, J. The petitions in these cases are filed under sec-
tion 163 of the General Election act as revised in 1898.
*Pamph. L., p.* 312.

"By section 169 of that act the court is required to try the
issues without a jury.

"The incumbents move to dismiss the petitions because
they are not sufficiently specific and particular under the
statute. If the official endorsements on the ballots objected
to, and set out in the petition, constitute those ballots such
as have a distinguishing mark, within the statute, then the
petition does state sufficient facts to sustain it under subdi-
vision 7 of section 163. As that is the issue in the case,
upon the merits, it is better to determine that question under
the agreed facts, hence the motion to dismiss is denied.

"Is Long Branch a town? If it is, then, by the express
provision of the act of 1901 (*Pamph. L., p.* 324), official

ballots are required at local elections held therein. The act of 1901 is a supplement to the revision of 1898 of the general act to regulate elections.

"Long Branch was created with certain municipal powers under an act entitled 'An act to establish the Long Branch police, sanitary and improvement commission,' approved April 11th, 1867. *Pamph. L., p.* 976.

"The powers given by this act were limited, relating almost exclusively to the right to pass ordinances on a few subjects of police power, sanitation, and the regulation of parks and public grounds. The commissioners were severally given the power of justices of the peace, with authority to appoint marshals. They had no power of taxation. By supplements, passed from time to time, their powers have been enlarged, but they are, by their original act, and all supplements thereto, legally known as 'The Long Branch Commission.'

"By section 85 of the General Election law of 1898, it is provided that 'the provisions of this act relating to the nomination of candidates and the use of official ballots and envelopes shall apply to all general elections throughout this state and to the charter, local or special elections in all of the cities of this state, but shall not apply to any township, town, borough or other municipality of this state.'

"It is contended that the word 'town,' as used in the act of 1901, is used generically, and applies to all municipalities, except cities which are already required by section 85 of the Election act to have official ballots at local elections.

"I am unable to give the act of 1901 this construction. The General Election law specifies that cities shall have official ballots at local elections, and that 'townships, towns, boroughs and other municipalities of this state,' shall not. The legislative supplement of 1901 takes towns out of the class not required to have official ballots, and says that they shall thereafter be required to have them. It seems clear that this act was only meant to apply to towns, and that the townships, boroughs or other municipalities, classified under the General Election act, should remain as they were and not be required to have official ballots. This construction is

also strengthened because we have a general act for the formation and government of towns, as a class, as well as one for the formation and government of boroughs, and there would seem to be no more reason for extending the supplement of March 22d, 1901, to all municipalities other than cities than there would have been if the act of 1901 had extended the requirement for official ballots to the class called 'boroughs.'

"The act of 1901 simply lifted towns out of the exception as to official ballots under section 85 of the Election act. Long Branch is not a town within the act approved March 22d, 1901, and hence official ballots are not required at the local elections held therein. Under this view, all the ballots cast for the contestants should have been counted.

"The agreed facts in evidence show that under the advice of the counsel of the Long Branch commission, nominations were made and filed and official ballots issued by the clerk of the commission for the local election held therein on December 10th, 1901, and that these ballots only were given out by the judges in all the election districts save one. It appears that the other ballots containing the names of the contestants were presented at all the polling-places, but were not given out by the judges except in one district. Nor were the ballots voted for the contestants counted and returned by the election boards except in one election district. It appears, however, that if all the ballots cast for the contestants had been counted, none of them would have been elected, as the ballots containing the official endorsement were, in any event, sufficient to have elected the persons named thereon in all cases.

"The highest vote cast for any one of the candidates for commissioner-at-large upon the 'Independent ticket' was 573, while the lowest candidate on the 'People's ticket' received 1,033. The same ratio of difference runs through the whole list of the contestants.

"This leaves but one question for determination, and that is, were the ballots cast for the incumbents all void because of the official endorsement placed thereon by the clerk of the

Long Branch commission? The character of the endorsement appears by the exhibits.

"No such conclusion should be reached if it is possible to avoid it. The sacred right of suffrage is too dear to be defeated by an act for which the voter is not responsible, unless by the direct mandate of a valid statute no other construction can be given.

"By section 85 of the Election law it is provided: 'If on the face or back of any ballot or envelope enclosing ballot there shall be any mark, sign, designation or device whatsoever, other than is permitted by this act, whereby such ballot or envelope can or may be identified or distinguished from any other ballot or envelope used. at such election, the ballot enclosed in such envelope shall be absolutely void and not counted for any candidate named thereon.'

"A careful reading of this provision with the whole act makes it quite plain that the legislative purpose was to prevent a voter, or one acting for him, from distinguishing his ballot by any mark, sign, designation or device. The inhibition is against the marking of a ballot so that it can be 'identified or distinguished from any other ballot' used at the election. If a large class of the ballots used have the same accidental or intentional mark or designation upon them, as in this case, but· for which mark or designation the voter is in no way responsible, such a ballot is not within the interdiction of the statute which makes a marked ballot void. It was never the legislative intent, nor is it the proper statutory construction, to defeat the vote of the citizen by an act for which he was neither directly nor indirectly responsible; nor for a negligent or willful act of a municipal official; nor for the misconception of any legal duty or form required in. the preparation of ballots issued by such an official for distribution to the voters. The Election act was only intended to defeat a ballot which was so marked that it was apparent that the voter had, for some purpose, corrupt, or otherwise, so marked it or permitted it to .be marked, that it could be identified or distinguished from 'any other ballot' used at such election. *Hackett* v. *Mayhew, 33 Vroom* 481.

"Webster defines 'distinguishing' as 'constituting a difference or distinction from everything else;' and 'mark,' as 'a visible sign or impression made or left upon anything, as a line, point, stamp, figure or the like drawn or impressed as to attract attention and convey some information or intimation;' and 'sign,' as 'that which furnishes evidence—a mark, an indication—a proof.'

"The mark to defeat a ballot must be one which is put there with a design to convey some information or intimation desired by the voter; it must be a sign to be used for proof of some fact the voter wishes established. It must be apparent that it was intended to individualize the particular ballot cast at the election. It might be that ten, twenty or even one hundred ballots bearing the same kind of a mark would be clearly void, under the statute, if it was apparent that the mark or sign found on each ballot was placed there by the act of the voter or another for him for the purpose of proof of the identity of each particular ballot, but that is not this case. The agreed facts make it impossible to even infer that there was any intent to attempt the identification of any ballot cast by any particular voter. Every ticket upon which the incumbents ran was endorsed by a certificate of the municipal clerk in the manner required where official ballots are necessary. Such endorsement was unnecessary under the law; illegal, if you will, but still it was in no sense a distinguishing mark, within the statutory meaning, when the ballot was found in the box after the voting had ceased. Every ballot of the 'People's ticket' was found to be of that exact kind. If the statute could be said to make such wholesale disfranchisement of citizens possible, through no fault of their own, I should not hesitate to declare such a statute to be unconstitutional under the principles so clearly stated by Mr. Justice Dixon in *Ransom* v. *Black, 25 Vroom* 446, 459, which case was affirmed in the Court of Errors and Appeals, for the reasons given by that learned justice.

"Judgment may be entered for the incumbents."

Before GUMMERE, CHIEF JUSTICE, and Justices VAN
SYCKEL, GARRISON and GARRETSON.

For the appellant, *James Steen, John S. Applegate* and
*Richard V. Lindabury.*

For the respondent, *Eusebius W. Arrowsmith* and *Alan H.
Strong.*

The opinion of the court was delivered by

GARRISON, J. This is an appeal from a judgment pro-
nounced by the Circuit Court of Monmouth county in a con-
tested election case arising under section 162 *et seq.* of "An
act to regulate elections" [Revision]. *Pamph. L.* 1898, *p.*
237.

The election, which was held upon December 10th, 1901,
was for the local officers of Long Branch, a municipality gov-
erned under the provisions of "An act to establish the Long
Branch police, sanitary and improvement commission," ap-
proved April 11th, 1867. Two tickets were in the field,
known respectively as the People's ticket and the Independ-
ent ticket. The incumbent (here the respondent) was run-
ning for collector on the People's ticket. The contestant ran
for the same office on the Independent ticket. By the official
return of the board of canvassers, the incumbent received
one thousand and two votes and the contestant one hundred
and ninety-two. Upon the recount before the Circuit Court
the vote for the incumbent was unchanged, while that for the
contestant was increased by four hundred and seventeen votes
which had been thrown out by the judges of election. The
reason for this increase, while not material upon this proceed-
ing, will appear from a history of the case, which may be
summarized as follows:

Prior to March 22d, 1901, official ballots were, by force of
section 85 of the revised Election law, required in the charter
and local elections in all the cities of the state, but not in
"any election in any township, town, borough or other munici-
pality of the state." On March 22d, 1901, a supplement to

this act was approved (*Pamph. L., p.* 324) by which it was enacted that "all the provisions of the act to which this act is a supplement relating to the nominations of candidates and the use of official ballots and envelopes shall apply to the charter, local, municipal and special elections in all of the towns of this state in the same manner and to the like effect as in and by said act the same are made applicable to the charter, local or special elections in the cities of this state, anything in said act to the contrary notwithstanding."

The municipal clerk of Long Branch, deeming that this supplement applied to that municipality, caused official ballots to be prepared for those candidates whose nominations had been filed with him, placed his official endorsement and signature upon such ballots and delivered them to the election officers of the several election districts, who, acting under the advice of the city solicitor of Long Branch, distributed these ballots alone to the electors and counted only such ballots as bore the official endorsement of the said clerk. In fine, the election was conducted throughout as if the supplement of 1901 applied to Long Branch.

The candidates named upon the People's ticket had filed with the clerk their petition of nomination, and ballots bearing their names and the official endorsement were cast and counted to the number of one thousand and two for the incumbent. The candidates named on the Independent ticket had not filed any petition of nomination with the clerk, and hence their ballots did not have the official endorsement. Such ballots to the number of four hundred and seventeen were rejected by the board in canvassing the votes, although votes to the number of one hundred and ninety-two were returned as cast for the contestant. The incumbent received a certificate of his election, whereupon the contestant petitioned the Circuit Court under the statute above cited.

The claim of the contestant before the Circuit Court was that all of the ballots cast for the incumbent should be thrown out, upon the ground that the official endorsement was a mark or device not permitted by the act regulating elections, whereby they might be distinguished from other ballots cast

at such election, referring to section 58. *Pamph. L.* 1898, *p.* 267. If this contention of the contestant is well founded it is immaterial whether the contestant is credited with six hundred and nine votes or with four hundred and seventeen or with one hundred and ninety-two votes only. The crucial question was and is whether the ballots that bore the official endorsement were for that reason void; and this in turn was deemed to depend upon whether the supplement of 1901 applied to Long Branch. So that one of the questions considered in the Circuit Court was whether Long Branch was a town within the meaning of that act. The Circuit Court thereupon construed the statute of 1901 and held that "Long Branch was not a town within the act, and hence that official ballots were not required at the local elections therein, under which view all of the ballots cast for the contestant should have been counted." Consequently, four hundred and seventeen ballots that had been rejected by the canvassers were counted for the contestant by the Circuit Court, giving him a total of six hundred and nine votes.

The soundness of this decision concerning the act of 1901 is neither affirmed nor denied, such determination not being thought necessary in view of the broader question presented by this appeal. That question is whether at an election conducted under the Election law of 1898 official ballots prepared and endorsed by a municipal clerk in supposed compliance with the legislative will as expressed in supplemental legislation and distributed and counted by the proper election officers, should, upon a recount, be thrown out if the Circuit Court reached the conclusion that the clerk had misconceived the meaning of such supplemental law. The mere statement of the proposition in this form suggests that the controlling question may be not whether the construction placed by the clerk upon the language of the new statute was the correct one, but whether the clerk was not placed in a position where it became his duty to construe such new law in the due administration of his office as part of the election machinery provided by that act, and whether in such juncture the official conduct of the clerk rendered void the ballots furnished by him to the

electors. That some meaning must be put upon a legislative enactment by the executive and ministerial officers affected by it is obvious. That such constructions, when honestly made and acted upon receive a certain recognition irrespective of their correctness is a fact of common legal knowledge, so much so that when a statute of uncertain meaning has been interpreted in a certain way for a sufficient length of time by the ministerial or executive officers affected by it such construction takes rank with judicial exposition. *Pioneer* v. *Bagnoll,* 20 *Vroom* 226, is a case in point. Numerous other illustrations of this rule may be found in *Suth. Stat. Const.* 392, § 308.

Premising, therefore, that the duty of construing legislative language may, at times, by warrant of law, fall to the lot of ministerial officers in the first instance, we turn to the statute law regulative of elections in order to see whether such was, in the present case, the duty of the clerk of Long Branch, and if so, to determine what effect a mistake upon his part should have upon the electors who voted the ballots issued by him under such misconception, if such it was.

Section 48 of the Election law provides that "all ballots cast at any election shall (except as herein otherwise provided) be printed and distributed at public expense, and no ballots shall be cast or counted at any such election except such as are by this act provided." Section 49 provides that "in cases of election within and for a single municipality of any county where the certificate of nomination is, pursuant to this act, to be filed with the clerk of such municipality, such municipal clerk shall provide such ballots." Section 50 provides that "on the back of each of the said ballots to be printed by the  *  *  *  municipal clerks shall be printed the words, "Official ballot," and then shall follow  *  *  * a fac-simile of the signature of  *  *  *  the municipal clerk by whom such ballot was prepared." By section 85, as has been already pointed out, the provision for the preparation and use of official ballots applied to all cities of the state, but not to any other municipality, and by the supplement of March 22d, 1901, all of the said provisions relating to the

nomination of candidates and the use of official ballots were extended to the charter, local and municipal elections held in all of the towns of this state.

It is obvious that if the supplement of 1901 applied to Long Branch it was the duty of the clerk of that municipality to prepare the official ballots for use at the election in question, and it seems to be equally obvious that the duty of deciding whether such supplement did require the use of such ballots was in the first instance cast upon such clerk; always assuming that the language of said supplement fairly admitted of such construction.

That the question of construction thus presented was a fairly debatable one must, I think, be at once apparent to anyone at all conversant with the state of judicial decision upon the subject of legislation affecting "towns."

In the historic case of *Van Riper* v. *Parsons*, 11 *Vroom* 1, the word "town" was given a significance broad enough to include every municipality in the state, including cities.

In *Pell* v. *Newark*, 11 *Vroom* 550, Chief Justice Beasley, speaking for the Court of Errors and Appeals, said that the word "towns," standing in its generic sense, embraced townships as well as cities, "and all other places corporate established for local government of the same grade as these and also those of an inferior order, if any such there be."

In *Banta* v. *Richards*, 13 *Vroom* 497, Mr. Justice Dixon, speaking for this court, said: "The word used in the law throughout is 'town.' This is a word of varying significance. * * * But so uncertain is this term 'towns' that a construction which rested upon the word alone would be quite unsatisfactory;" and the opinion held in conclusion that townships were not included among "towns" in the act under consideration.

In *Broome* v. *Telephone Co.*, 20 *Vroom* 624, the same learned jurist said: "The import of the word 'town' in our legislation is so variable that its signification in any particular enactment must largely depend upon the occasion and purpose of the law," holding in conclusion that in the statute under consideration "the word 'town' should receive an inter-

pretation broad enough to include all such places whether they were formally styled towns, townships, boroughs or villages."

In *Stout* v. *Glen Ridge,* 30 *Vroom* 201, Mr. Justice Magie said: "It is undeniable that the word 'town' has been used in our legislation in different senses;" concluding that in the act under review it included every species of municipal corporation below that of city and above that of township.

In *Brown* v. *Town of Union,* 33 *Vroom* 142, Mr. Justice Van Syckel held that "the word 'towns' embraced the whole range of bodies corporate less than counties established for local government."

And in *Long Branch* v. *Dobbins,* 32 *Vroom* 659, in the opinion of the Court of Errors, delivered by Judge Nixon, it was said, *arguendo:* "If Long Branch is not a village it certainly is a town."

Enough has been said, I think, to establish the proposition that the question whether Long Branch was included under the designation of "towns" in the supplement of 1901 was a fairly debatable question imperatively demanding a construction in order to ascertain its practical bearing upon the duties prescribed for the clerk of that municipality. Indeed, speaking for myself, I may say that notwithstanding the act for the formation, establishment and government of towns (*Pamph. L.* 1895, *p.* 218), the construction given to the act of 1901 by the clerk and solicitor of Long Branch has much show of reason and some respectable *dicta* in its favor. However that may be, the point reached is that the law was of debatable import and that it had to be construed by the clerk one way or the other in determining whether he should or should not prepare and issue official ballots for the use of the electors of Long Branch at the election in question.

This brings us to the second point of inquiry, viz., what should be the effect of such official action upon these electors, assuming that the clerk erred in his construction of the law? The legislation pertinent to this branch of the case is contained in the fifty-eighth section of the Election law, and is in these words:

"If any ballot voted at any election shall have thereon, either on its face or its back, any mark, sign, designation or device whatsoever, other than is permitted by this act, whereby such ballot can or may be identified or distinguished from other ballots cast at such election, such ballot shall be absolutely void and shall not be canvassed or counted for any candidate named thereon."

It is to be observed that the mark or device proscribed by this language is any that is not permitted by the act in question, to wit, the Election law. This must, I think, be taken to refer not only to such marks as were expressly allowed by the lawmaker, but also such as resulted from the application of established legal rules to the scheme of official duty imposed by the act itself. It extended, therefore, so far as such legal principles carried it, to the marking of ballots as official where such marking resulted from the construction of a pertinent legislative enactment made by the election officer to whom the act itself, in the first instance, committed the duty of making such construction. If this be so, it follows that the official ballots furnished to the electors of Long Branch by the municipal clerk, under his construction of the act of 1901, were not marked ballots within the meaning of the eighty-fifth section of the Election law, but that they were rightly treated at such election as legal votes, irrespective of the correctness of the clerk's construction of the statute in question. This, at least, is the conclusion to which I have come after giving to the subject that consideration which the non-appealable character of the present decision demands. *Pamph. L.* 1894, *p.* 491; *O'Brien* v. *Benny,* 29 *Vroom* 189.

To hold otherwise would be in effect to say that the legislature had permitted a certain officer to decide that ballots bearing an official endorsement could alone be used at a given election, and yet had intended that such official endorsement should of itself be a mark or device not permitted by the act that granted such permission. The legislature will not lightly be presumed to have intended a result so palpably unreasonable as to expose its entire election system to the alternative of absolute unconstitutionality. This seems to me to be the

proper outcome and solution of the important practical question raised by this appeal. At the same time this course leaves unimpaired the original construction placed upon the section of the law last cited by Mr. Justice Depue in the cases of Ulrich *v.* Freiensehner and Kearns *v.* Edwards, given shortly after the adoption of the reformed Election law. These cases were decided in the Essex Circuit Court by Mr. Justice Depue in 1891 and 1894, respectively, and it is a matter of regret that they are not directly accessible in our state reports. They are to be found, however, in the "New Jersey Law Journal" for those years. *Ulrich* v. *Freiensehner,* 15 *N. J. L. J.* 74; *Kearns* v. *Edwards,* 17 *Id.* 51. The latter case is also reported in 28 *Atl. Rep.* 723.

The point decided in each case was that the legislation in question superseded wholly the common law rule of ascertaining if possible what the intention of the voter was, and substituted for it a legislative fiat that was to be enforced regardless of the supposed intention of the voter and without extraneous evidence.

These rulings have hitherto been approved and followed by this court, and there is no intention, in the present case, to depart from them or to detract in the least degree from their authority.

The result is that upon this appeal the judgment rendered in the Circuit Court is affirmed.

The case of Nordell *v.* Vannote, which was argued at the same time, is ruled by the above decision upon the merits, hence it is not necessary to decide whether the contestant could make his contest against an incumbent who was one of three commissioners and had not received the lowest number of votes cast for the office.